# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

PATRICK A. KENNEDY,

                Plaintiff,

      v.

MARIA LEHMAN, Erie County Commissioner
of Public Works, DAVID BOEHM, Erie County
Senior Highway District Engineer, JERRY
SENTZ, Erie County Director-Energy, Utility
and Grant Management, Individually and in
their Official Capacity and ERIE COUNTY,
NEW YORK,

                Defendants.

**REPORT AND
RECOMMENDATION
03-CV-531**



## Preliminary Statement

Presently before the Court is defendants' motion for summary judgment. (Docket #19). In his complaint, plaintiff alleges that while he was employed by the Erie County Highway Department, defendants denied him his rights under the First and Fourteenth Amendments, in violation of 42 U.S.C. § 1983. (Docket #1). By Order of Judge Richard J. Arcara, dated November 14, 2006, all dispositive motions have been referred to me pursuant to 28 U.S.C. §636(b)(1)(A)-(B) for a Report and Recommendation. (Docket #37). The following is my Report and Recommendation as to defendants' motion for summary judgment.

### Relevant Facts

Plaintiff Patrick Kennedy began working for the Erie County Highway Department as a laborer in 1985. See Complaint at ¶ 10 (Docket #1). On July 1, 2002, he was promoted to General Crew Chief at the East Aurora Highway Barn. Id. At that time, the facility's Senior Highway Engineer and plaintiff's direct supervisor was Douglas Naylon, who had been provisionally appointed to his position in 2000. See Complaint at ¶ 14; Defendants' Statement of Material Facts at ¶ 8 (Docket #20). According to plaintiff, he and Naylon had a very good working relationship, but because Naylon was a demanding supervisor, he was "unpopular with some of his subordinates." See Affidavit of Patrick A. Kennedy, ¶ 12 (Docket #30). By late 2001, plaintiff also realized that Naylon was "unpopular with certain of his superiors in the [department], most notably Defendant Lehman, who was Commissioner." See Kennedy Aff. at ¶ 13; Plaintiff's March 3, 2003 letter, annexed as Defendants' Exhibit J (Docket #21).

According to defendants, their problems with Naylon began when they received complaints from employees about corruption in the East Aurora Barn. In the summer of 2002, two FBI special agents were assigned to investigate. See Defendants' Statement of Material Facts at ¶ 13. Specifically, it was believed that Naylon had taken County furniture to his house, had used County stone for

2

a fire pit at his residence, had taken lumber and equipment that had been purchased by the County and was disproportionately sending business to a particular contractor. Id. at ¶ 14.  It was also believed that Naylon had hidden a recording device in the employee break room, but no such device was found by the agents. Id. ¶ 14-16.  During the FBI's investigation, plaintiff alleges that the agents came to his home and accused him of stealing. See Complaint at ¶ 17.  Ultimately, the agents could find no evidence of federal violations, so they turned the investigation over to the Erie County Sheriff's Department. See Defendants' Statement of Material Facts at ¶ 18.

In addition to law enforcement's investigation, Erie County Commissioner of Public Works Maria Lehman asked Jerry Sentz and Annette Juncewicz, two senior Department of Public Works employees, to conduct an internal investigation into the allegations. Id. at ¶ 17.  In August 2002, Juncewicz prepared a report, finding that there was poor record keeping at the Aurora facility and that proper County purchasing procedures had not been followed. Id. at ¶ 20; Defendants' Exhibit I.

In December 2002, the Erie County Comptroller initiated another audit of the East Aurora Barn, which included a review of time cards, invoices, crew chief reports, cell phone records and interviews with employees. See Defendants' Statement of Material

Facts at ¶ 21, 24.   During this audit, several employees of the facility reported receiving anonymous threatening phone calls in an apparent effort to discourage them from cooperating in the investigation.   Id. at ¶ 28.   Lehman reported the incident to the Erie County Sheriff's Department, which conducted an investigation into the threatening phone calls.   Id. at 29.   Jerry Sentz attended the interviews conducted by the Sheriff's department.   According to Sentz, the employee interviews revealed improper use of County equipment and that employees who were aligned with Naylon (such as Kennedy) received favorable treatment, whereas those who questioned his practices did not.   Id. at ¶ 31; Affidavit of Gerard Sentz at ¶ 18, annexed as Defendants' Exhibit B (Docket #21).   Plaintiff denies receiving any favoritism from Naylon.   See Plaintiff's Response to Statement of Undisputed Facts at ¶ 15 (Docket #16).

In December 2002, in the midst of these investigations, Naylon filed a complaint of harassment, discrimination and retaliation against Lehman with the County's EEO Office.   See Kennedy Aff., ¶ 20.   According to plaintiff, Naylon identified twenty incidents of harassment that occurred between March and November 2002. Plaintiff was listed as a witness for six of the incidents.   Id. at ¶ 23.

In addition, during this time, Commissioner Lehman discovered a large dead fish on the fence post outside her home.   This event

4

was "very upsetting and unsettling" to Lehman and her family and she filed a police report. See Affidavit of Maria Lehman at ¶ 27, annexed as Appendix Exhibit F. She believed that Naylon or someone associated with him, such as Kennedy, placed the fish there as a way of discouraging her from investigating the allegations at the Aurora Barn. Id. at ¶ 26. Plaintiff "emphatically denies" that he had anything do to with the incident. See Plaintiff's Response to Statement of Undisputed Facts at ¶ 16. Lehman states that she never blamed Kennedy for the incident by name (see Affidavit of Maria Lehman at ¶ 28), however Daniel Rider, the Deputy Commissioner of the Highway Department, testified at his deposition that Lehman did specifically name Kennedy as the person whom she believed was responsible for leaving the dead fish on her property. See Rider Dep. Tr. at pages 31-33 (Defendants' Exhibit X).

On January 29, 2003, shortly after the Comptroller's audit began, Naylon was terminated from his provisional appointment because he failed the civil service exam that was required to be a permanent senior highway engineer. See Defendants' Statement of Material Facts at ¶ 23. Commissioner Lehman appointed David Boehm to temporarily fill the position in addition to retaining his position as senior highway engineer for the Hamburg District. Id. at ¶ 25.

According to plaintiff, Lehman, Sentz and Boehm discriminated

against him because of his close relationship with Naylon. Plaintiff states that the day after Naylon was terminated, Sentz, knowing that plaintiff and Naylon had "an excellent working relationship," came to the Aurora Barn and "taunted" plaintiff, asking how things were going now that Naylon had been fired. <u>See</u> Complaint at ¶ 28; Kennedy Aff., ¶ 27. On March 3, 2003, plaintiff filed a complaint with Daniel Rider, the Deputy Commissioner of the Highway Department. <u>See</u> Defendants' Statement of Material Facts at ¶ 37; Defendants' Exhibit J.[1] The following month, plaintiff filed a complaint with the County EEO Office. <u>See</u> Defendants' Statement of Material Facts at ¶ 44. In his complaints, plaintiff alleges that Boehm reduced plaintiff's responsibilities and supervisory authority, avoided speaking to him, excluded him from meetings, took away plaintiff's assigned County truck and replaced it with an older truck and refused to approve his overtime. <u>See</u> Complaint at ¶ 29-39; Kennedy Aff., ¶ 28-36. Boehm denies limiting or refusing plaintiff's overtime, states that he never tried to take away plaintiff's assigned County truck and did not exclude him from meetings. <u>See</u> Affidavit of David Boehm, annexed as Defendants' Exhibit Y.

In April 2003, the Aurora Barn was temporarily closed due in

---

[1] On the same day, Rider received complaints from two other employees raising similar allegations of discrimination based on their association with Naylon. <u>See</u> Defendants' Statement of Material Facts at ¶ 38; Defendants' Exhibit L.

part to the pending investigations. See Lehman Aff. at ¶ 29. According to Lehman, other reasons for the closure included the deployment of the Senior Highway Maintenance Engineer to Iraq and the need for "building improvements, including asbestos abatement." Id. However, according to plaintiff, no building improvements or asbestos abatement were performed. See Plaintiff's Response to Statement of Undisputed Facts, ¶ 17. Rather, plaintiff believes that "the Aurora Barn was closed in order to remove all the workers from that location and disperse them throughout the County." Id.[2]

When the Aurora Barn was closed, plaintiff was transferred to the Clarence facility, which according to him was another example of discrimination and retaliation because it was located the farthest from his home. See Kennedy Aff., ¶ 49-50. Plaintiff also states that he was not permitted to bid on a position of his choice, which he was entitled to do under the provisions of the collective bargaining agreement that governed his job. See Complaint at ¶ 46-50. In his opposition papers, plaintiff avers that he was assigned to Clarence "in retaliation for having been named as a witness in Mr. Naylon's harassment complaint and for having complained to Mr. Rider." See Kennedy Aff., ¶ 67. Sentz

---

[2] According to plaintiff, his belief is supported by Boehm's announcement to the Aurora Barn workers that "the Fabulous Four [including plaintiff] are out of here and are going to four separate ends of the County." See Kennedy Aff., ¶ 30.

7

responds that he sent plaintiff to Clarence because he felt "Mr. Kennedy's services were most needed [there] to assist the other General Crew Chief at Clarence who was struggling with a back injury." See Sentz Aff., ¶ 24. Plaintiff refutes this reasoning, stating that the Clarence Crew Chief was performing all of his duties without accommodation and that plaintiff was put to work as a Motor Equipment Operator. See Kennedy Aff., ¶ 59-66.

On May 8, 2003, plaintiff left the Clarence facility, claiming that his work as a Motor Equipment Operator had exacerbated a prior work-related back injury. See Kennedy Aff., ¶ 76. According to plaintiff, his doctor certified him as "totally disabled." Id. at ¶ 86. Plaintiff subsequently filed a workers' compensation claim against the County and never returned to work. See Defendants' Statement of Material Facts at ¶ 48. On October 23, 2003, although plaintiff was still out on disability, he was notified that he was being reassigned to the East Aurora Highway Barn. See Defendants' Exhibit S.

On September 9, 2003, the Comptroller released her report on the investigation of the Aurora Barn, concluding that there had been an abuse of overtime and temporary titles, County equipment had been misused and that County purchasing procedures had not been followed. See Lehman Aff. at ¶ 30; Defendants' Exhibit R.

One month later a Special Grand Jury convened to investigate

the alleged corruption at the Aurora Barn and ultimately issued an indictment charging Naylon with fifteen misdemeanor counts including official misconduct, theft of services and petit larceny. Id. at ¶ 31-33; Defendants' Exhibit T. Naylon later pled guilty to two of the counts which involved him directing plaintiff to misuse County equipment. See Lehman Aff. at ¶ 31-33; Defendants' Exhibit U. According to Commissioner Lehman, she believes that plaintiff "engage[d] in activities that were in violation of County policy in his position of General Crew Chief." See Lehman Aff. at ¶ 35.

On October 8, 2004, Sentz sent a letter notifying plaintiff that he would be terminated effective October 23, 2004 because he had been out of work on leave without pay for over one year. See Defendants' Statement of Material Facts at ¶ 56; Sentz Aff., ¶ 33; Defendants' Exhibit C. This letter also references a September 23, 2004 letter which was sent to plaintiff via certified mail, advising him that his leave of absence was approaching the one year mark and that he had fifteen days to apply for a reasonable accommodation or return to his position. Id. According to defendants, plaintiff did not do either and never responded to the letter, so he was terminated. Id.

With this lawsuit, plaintiff makes three claims: (1) he alleges that his transfer to the Clarence facility constituted a denial of his due process rights under the Fourteenth Amendment, (2) he alleges that he was discriminated and retaliated against for

9

his association with Naylon in violation of his First Amendment rights and (3) he alleges that he was defamed by the defendants.

## Discussion

Summary Judgment Standard: The general principles used to evaluate the merits of summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is warranted where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, all ambiguities and inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995). While the burden of showing that no genuine factual dispute exists is on the defendant, when faced with a properly supported summary judgment motion, plaintiff must "come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Such a showing "is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants." United States v. Potamkin Cadillac Corp., 689 F.2d 379, 381 (2d Cir.

1982)(internal citation omitted). Finally, "the mere existence of factual issues - where those issues are not material to the claims before the court - will not suffice to defeat a motion for summary judgment." <u>Quarles v. General Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985).

1. <u>Plaintiff's Due Process Claim</u>: Plaintiff's first cause of action alleges a denial of his right to due process. Plaintiff claims that he "had a property interest in his position as General Crew Chief at the Aurora Plant" and that property interest was taken away from him by defendants without procedural due process when he was temporarily transferred to the Clarence Plant. <u>See</u> Complaint at page 8.

The Fourteenth Amendment prevents the state from depriving any person of liberty or property without due process of law. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it [or a] unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." <u>Id</u>. at 577. Thus, to establish a violation of either substantive or procedural due process, plaintiff must initially show that he was deprived of a property or liberty interest. <u>Gordon v. Nicoletti</u>, 84 F.Supp.2d

11

304, 308-09 (D. Conn. 2000).   The first inquiry, therefore, is whether plaintiff had a constitutionally protected property or liberty interest in not being transferred from the East Aurora plant.

Based on the record before me, I find that plaintiff's claim that he was deprived of a constitutionally protected property interest when defendants changed his job location to the Clarence Plant to be legally unsupported.   Although New York law and the collective bargaining agreement created a property interest in Kennedy's <u>continued employment</u> with the County, they did not create a protected property interest in being assigned to a <u>particular job location</u>, especially where plaintiff's job title, grade level and pay did not change as a result of the transfer.   <u>See Anglemyer v. Hamilton County Hosp.</u>, 58 F.3d 533, 539 (10th Cir. 1995) (citing to the "overwhelming weight of authority" that, absent a specific statutory or contractual provision to the contrary, no protected property interest is implicated when an employer reassigns or transfers an employee) (collecting cases); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1205 (3d Cir. 1988) (employment decisions which "do not terminate or abridge" the employment contract do not constitute deprivations of property interests under the Fourteenth Amendment); <u>Lynch v. McNamera</u>, 342 F.Supp.2d 59, 65-66 (D. Conn. 2004) ("[a]s Defendants rightly argue, reassignments and transfers generally do not implicate a protected property interest for the purposes of due

process, unless accompanied by a loss in pay")(collecting cases);

Humberson v. U.S. Attorney's Office, 236 F.Supp.2d 28, 31 (D.D.C. 2003)(where plaintiff had not been discharged or suspended but only had his job responsibilities reduced for a period of time, court found that his property interest in his employment was not implicated).

Contrary to his claims, the two Civil Service Law provisions Kennedy relies on (see Plaintiff's Memorandum of Law at page 11) did not create an entitlement for him to remain in the East Aurora plant or obligate the County to transfer him to a plant of his choosing when the Aurora plant temporarily closed.   Civil Service Law § 61(2) forbids a public employer from requiring a civil service employee to "continually perform the duties of a higher position" so as to "not frustrate the promotional policies built into the [Civil Service] Act." Nauta v. City of Poughkeepsie, New York, 610 F.Supp. 980, 984 (S.D.N.Y. 1985).  Since Kennedy was not assigned the duties of a higher position when his job location was changed, § 61(2) is not applicable.  Civil Service Law § 70(1) is similarly inapplicable to plaintiff's reassignment to the Clarence plant.   Section 70 is not relevant to the reassignment of an employee's job location where the employee remains under the jurisdiction of the same department.  McMorran v. New York State Office of Mental Health, 256 A.D.2d 709 (3rd Dept. 1998).  Here, Kennedy's transfer was simply to a different job site within the

13

jurisdiction of the Highway Department.   Hence, § 70(1) did not create an entitlement upon which plaintiff may properly rely in asserting his due process rights.

The collective bargaining agreement (CBA) at issue here did not create any contractual rights sufficient to form the basis for a due process violation.   Section 17.1 of the CBA allowed the County to reassign an employee from one work location to another so long as the reassigned employee was "the least senior employee in the job title, capable of performing the work, from the work site selected by management."   Kennedy does not dispute that he was the only crew chief at the Aurora plant when the decision was made to close the entire plant and transfer <u>all</u> the plant employees to alternate job locations.   As the only crew chief at the Aurora location, Kennedy was also the least senior in his particular job title and thus was subject to reassignment at a location determined by his employer.   <u>See</u> Exhibit "W" annexed to Docket #21 at page 28-29.   Plaintiff's reliance on section 20.1 of the CBA is without merit as that section requires an employee to make a request to change work location in January.   Here, plaintiff was transferred to the Clarence plant in April and only worked at the Clarence plant for about two weeks before permanently leaving his job on sick leave.   Indeed, in October 2003, plaintiff was notified that he was being transferred back to his preferred job location, but never returned to work.   Plaintiff admits he was legitimately

14

terminated by the County "pursuant to New York Civil Service Law § 71 because he had been out of work on leave without pay for one year." See Defendant's Statement of Undisputed Material Facts at ¶ 56 (Docket #20) and Plaintiff's Response to Statement of Undisputed Facts (Docket #26) at ¶1.

Plaintiff's claim that he had a protected property interest in earning overtime pay is also without merit. "Every court in this circuit that has considered the issue of whether there exists a constitutionally protected property interest in overtime pay has answered in the negative, and with good reason." Cassidy v. Scoppetta, 365 F.Supp.2d 283, 287 (E.D.N.Y. 2005). Likewise, plaintiff's argument that he was singled out and subjected to a punitive transfer is belied by the fact that every employee in the Aurora plant was transferred because the entire plant was temporarily closed. Moreover, "[e]ven if Defendants did intend to transfer plaintiffs in an effort to punish them, plaintiffs fail to explain how Defendants subjective motivations are relevant to the determination of whether Plaintiffs have been deprived of a property right." Id. at 288.

In sum, it is my Report and Recommendation that plaintiff's due process rights were not violated because plaintiff cannot prove that he had a constitutionally protected property interest arising from his temporary transfer to the Clarence plant location. Accordingly, the defendants' motion for summary judgment on the due

process claim should be granted.

2.  First Amendment Claim: Defendants also move for summary judgment on plaintiff's claim that he was subjected to retaliation for his association with and support of Douglas Naylon in violation of his First Amendment rights.   Under established Second Circuit precedent, to establish a First Amendment retaliation claim, plaintiff must demonstrate that "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that his speech was a motivating factor in the determination." Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004)(citation and internal quotation omitted).   "Once a plaintiff satisfies these three factors, the government may avoid liability pursuant to either of two rationales.   The government may either (1) demonstrate by a preponderance of the evidence that it would have taken the same adverse action regardless of the protected speech, or (2) show that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression." Id.

Defendants' primary argument in support of summary judgment is that (1) plaintiff's associational activities were not a matter of public concern and, even if they were (2) plaintiff suffered no

adverse employment action as a result of exercising his First Amendment Rights.  Based on the current record, I disagree with both arguments.

Matters of Public Concern:  It is well settled that "[p]ublic employees do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment."  Cobb v. Pozzi, 363 F.3d at 101.  Nevertheless, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  Connick v. Myers, 461 U.S. 138, 147 (1983).  While the determination of whether speech constitutes a matter of public concern "may be somewhat fact-intensive, it presents a question of law for the court to resolve."  Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003).  The "public concern" requirement applies to both freedom of association claims and retaliation claims.  Cobb v. Pozzi, 363 F.3d at 102-07.

In Konits v. Valley Stream Central High School District, 394 F.3d 121, 125 (2d Cir. 2005), the Second Circuit held a public employee's willingness to be a potential witness in a co-worker's claim of employment related discrimination was "speech on a matter of public concern" deserving of First Amendment protection.  The

Court explained that "speech is of particular public concern when it involves actual or potential testimony in court or in administrative procedures.  Protection of the courts' interest in candid or truthful testimony, coupled with the rights of discrimination victims to seek protection in legal action, makes testimony or prospective testimony in discrimination suits a matter of particular public interest."  Id. at 125.   In Konits, the plaintiff was identified by a co-worker as being a potential witness in a claim of gender discrimination filed against the public employer.  The Second Circuit ruled that "[i]f Konits can prove that being so identified was a partial motivation for the retaliation she alleges that she suffered, then her First Amendment claim would certainly lie."

I find that Konits supports the "public concern" requirement of plaintiff's First Amendment claim.  In the summer of 2002, a public corruption investigation by the FBI was swirling around the East Aurora Barn and particularly plaintiff's direct supervisor Douglas Naylon.   In addition to the criminal investigation, defendant Lehman, Erie County's Commissioner of Public Works, ordered her staff to conduct an internal investigation regarding the Aurora Barn and Naylon.  In late 2002, Naylon filed an internal complaint of harassment, discrimination and retaliation against Lehman.  The complaint referenced the FBI investigation and alleged numerous incidents of intimidation and harassment by Lehman against

18

Naylon.   Plaintiff, whose support of Naylon was known by Lehman, was identified by Naylon as a witness to many of the incidents alleged in his complaint.   By letter dated December 12, 2002, Charles E. Aughtry, Erie County's EEO Director notified Lehman that the EEO Office had received a complaint in which Naylon had alleged that she had "engaged in conduct that violates the Erie County Harassment Policy" and an investigation into the allegations was commencing.   Lehman was further advised that "the County of Erie does not tolerate retaliation, in any form, against those who file complaints or participate in investigations."  The letter warned Lehman that she should not retaliate or "get individuals to retaliate on your behalf" against "any person you think may be participating in the investigation."   See Exhibit "E" annexed to Docket #30.

According to plaintiff, and viewing the facts in the light most favorable to him, Lehman and others acting in concert with her, subsequently retaliated against him because of his association with and support of Naylon.   It is true, of course, that unlike the plaintiff in Konits, Naylon's allegations of discrimination and harassment were not gender based.   But I do not read Konits so narrowly as to only apply to discrimination claims based on race, religion, gender, ethnicity or disability.   Rather, Konits was concerned with retaliation motivated by a desire to improperly influence an investigation or proceeding in order to prevent or

19

discourage candid and truthful testimony in that proceeding.  Under
Konits, I find that protection of that interest is a matter of
public interest.   Here, the County had created a process to
investigate employees' claims of discrimination, harassment and
retaliation.   It warned those subject to investigation that they
should not try to retaliate or impede the County's investigation.
Plaintiff was identified as a witness in a complaint that was
related to a public corruption investigation.[3]  Like the plaintiff
in Konits, if Kennedy can prove that being identified as a witness
in the Naylon complaint was even a partial motivation for the
retaliation he alleges that he suffered, then his "First Amendment
claim would certainly lie."   Konits, 394 F.3d at 125.   See also
Johnson v. Ganim, 342 F.3d 105, 112-114 (2d Cir. 2003)(fact that a
plaintiff has a personal interest in the subject matter of
"speech," does not remove it from First Amendment protection;
public corruption or wrongdoing are almost always matters of public
concern).

Finally, the parties argue over whether plaintiff's complaint
is deficient because it did not specifically allege that he was
subject to retaliation by the defendants as a result of being named
as a witness in Naylon's EEO complaint.   Plaintiff argues that he

---

[3]    The fact that Naylon was eventually convicted of public
corruption charges is of no moment to the issue of whether
Kennedy's speech was on a "matter of public concern" deserving
First Amendment protection.

has alleged sufficient facts to properly invoke his First Amendment associational rights, but requests permission to amend his complaint if his allegations are legally deficient. Defendants argue that "plaintiff has never, until now, linked any treatment of him by the defendants to the fact that Kennedy was named as a witness in Naylon's County EEO complaint." See Defendant's Reply Memorandum of Law (Docket #35) at page 7. According to the defendants, they were never on notice of this "theory" of retaliation, the link between Naylon's complaint and the alleged retaliation has not been sufficiently pled in the complaint, and in any event, a motion to amend is untimely and futile. Id. at 4-10.

I find that plaintiff's allegations of retaliation as set forth in his complaint comply with the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. In his second cause of action. Kennedy alleged that acts of retaliation were taken against him and those acts were motivated by his "association" with Naylon. It must be remembered that a complaint need only be a "short and plain statement of the claim" and need not allege every fact or every "theory" of recovery. Indeed, it is often true that during the discovery process a party learns of previously unknown facts that support the cause of action alleged in the complaint. "Litigants who must frame their claims before obtaining discovery often find it necessary to conform their theories to the facts as time goes on." Moriarty v. Larry G. Lewis

21

Funeral Directors Ltd., 150 F.3d 773, 777 (7th Cir. 1998).

Here, the internal EEO complaint filed by Naylon and which identifies plaintiff as a supportive witness was not only produced during discovery, but was also the subject of deposition questions directed at several witnesses. Defendant Lehman was questioned at length as to when she learned the identity of the employees who were listed as witnesses in the Naylon complaint and whether she was aware of County policy that forbids retaliation against witnesses. Lehman confirmed the fact that she was "displeased" with Naylon's complaints because she was assured "that Mr. Naylon was going to be a team player" and that Naylon's EEO complaints "riled" her up. See Lehman Deposition at pages 73-84. Defendant Sentz testified that Lehman discussed the Naylon EEO complaint with her and that she told him it was "unjustified." See Sentz Deposition (Docket #27-4) at page 66. Plaintiff was certainly viewed by defendants as an ally of Naylon and his association with Naylon as a favorable witness in Naylon's internal EEO complaint was identified during discovery as a possible motivating factor in the alleged retaliation. Accordingly, I find that defendants had sufficient notice of the relevant facts so as not to be prejudiced in defending this "theory" of retaliation.

Adverse Employment Action: Defendants also contend that plaintiff's First Amendment claims must fail because he never suffered an adverse employment action. Typically, adverse

employment actions involve "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). But "lesser actions" may also qualify as adverse employment actions. Id. In order to prove these "lesser actions" meet a level sufficient to support a claim of First Amendment retaliation, "plaintiff must show that (1) using an objective standard; (2) the total circumstances of [his] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model workplace." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002). Even "minor incidents" may be actionable if they "attain the critical mass of unreasonable inferiority." Id. (otherwise minor incidents that occur often and over time can rise to the level of a First Amendment violation).

Viewing the facts, as I must, in the light most favorable to plaintiff, I conclude that the combination of incidents alleged by plaintiff to have occurred between the summer of 2002 and May 2003 when plaintiff stopped working because of his back injury objectively "attain the critical mass of unreasonable inferiority." Phillips v. Bowen, 278 F.3d at 109. During this time period, Commissioner Lehman commenced an internal investigation of the Aurora Barn and plaintiff's direct supervisor Douglas Naylon. Plaintiff was considered by Lehman to be an ally of Naylon. As part of the investigation, Lehman checked for listening devices in

23

plaintiff's workplace, repeatedly changed the locks in plaintiff's workplace, told the deputy commissioner that plaintiff had planted a large dead fish on a fence post on her property in order to thwart the investigation, told the deputy commissioner that she had asked the FBI to commence a federal racketeering investigation (RICO) against plaintiff, told the deputy commissioner that plaintiff had threatened to kidnap the children of co-workers, was unfairly belligerent towards plaintiff, closed the Aurora Barn and transferred plaintiff to a work location that required him to commute the greatest distance, directed subordinates to demean his status as a general crew chief by reassigning him job duties inconsistent with his job title and took managerial duties away from him in retaliation for his support of Naylon. See excerpts of September 16, 2004 deposition of Daniel J. Rider; March 4, 2004 deposition of Douglas Naylon; and October 25, 2004 deposition of Maria Lehman, all annexed as exhibits to the January 7, 2005 affidavit of Richard H. Wyssling, Esq. (Docket #27). These facts, while clearly disputed by defendants, objectively describe a work environment "unreasonably inferior and adverse when compared to a typical or normal" work environment. Phillips v. Bowen, 278 F.3d at 109. As in Phillips, a finder of fact looking at these incidents collectively could find that they "rise to the level of actionable harm." Id. at 110.

In their reply brief (Docket #35) defendants argue for the

first time a claim that even if plaintiff has established a prima facie First Amendment violation, defendants have demonstrated "legitimate reasons for the actions taken against plaintiff" and there therefore there exists no "connection between his protected activity and the actions taken by the defendants."[4] See Reply Memorandum of Law at page 15.   Based on the record before me however, there are material issues of fact as to whether the actions taken by the defendant were indeed based on "legitimate" reasons and whether plaintiff's association with and support of Naylon was a motivating factor in the adverse employment actions taken.   Thus, assuming the Court should in fairness consider arguments made for the first time in a reply brief, material issues of fact make summary judgment on this ground inappropriate.

Similarly, summary judgment based on defendants' qualified immunity arguments is also inappropriate. Defendants Lehman, Sentz and Boehm briefly argue that they did not violate clearly established rights and that their actions were objectively

---

[4] It appears defendants have conflated two distinct burdens, one relevant to plaintiff's prima facie case and the other relevant to a specific defense once a prima facie case has been established. In order to demonstrate the third factor of a First Amendment claim, plaintiff must prove a causal connection between the protected speech and the adverse employment action.   Once the plaintiff establishes all three factors required for a prima facie case, then the government may still avoid liability by demonstrating that it would have implemented the same adverse employment action even in the absence of the protected speech. Defendants' apparent confusion, however, does not alter my determination on their First Amendment arguments.

reasonable.  Claims of qualified immunity are subject to a two-step analysis.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  First, a court asks whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?"  Id.  If the allegations fail to establish the violation of a constitutional right, the defendant is entitled to qualified immunity.  However, if the allegations establish a constitutional violation, the issue becomes whether that right was clearly established – that is, whether "it would be clear to a reasonable [person] that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 201.

The record here pays tribute to many factual disputes as to what happened and whether or not plaintiff's speech was a motivating factor in the adverse employment conditions he allegedly suffered.  "Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate."  Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003)(where there are factual disputes as to defendants' intent, summary judgment on plaintiff's First Amendment claim is inappropriate).  See also Lorusso v. Borer, 359 F.Supp.2d 121, 132 (D. Conn. 2005)(factual issues as to whether the protected speech

26

played a role in the adverse employment decision precluded summary judgment on qualified immunity grounds). As to the whether the constitutional right was clearly established, assuming the factual disputes are resolved in plaintiff's favor, the unlawfulness of retaliating against a public employee for supporting a fellow employee in his claim of harassment and discrimination was "reasonably and objectively apparent." Konits v. Valley Stream Central High School, 2006 WL 224188, *6 (E.D.N.Y. January 28, 2006)(on remand, court determined that in 1999 "[d]efendants should have been acutely aware of the impropriety of any retaliatory actions taken against plaintiff"). See Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1578 (5th Cir. 1989)(allowing retaliation against those who testify on behalf of others in discrimination hearings "would chill the employees' willingness to testify freely and truthfully" and thus properly forms the basis for a First Amendment claim under § 1983). Indeed, the county specifically warned employees against whom complaints had been filed that it was improper for them to retaliate or impede the County's investigation.

Finally, defendants argue "there is insufficient personal involvement or municipal policy to establish liability on the part of Lehman, Sentz or Erie County." See Defendants' Memorandum of Law (Docket #22) at page 10. As to the individual defendants, the record sets forth evidence of their personal involvement in the

adverse employment actions sufficient to raise triable issues of fact. However, as to the County of Erie, I agree with the defendants. Under 42 U.S.C. § 1983, a municipality may be liable for the violation of a person's civil rights if the moving force behind that violation was an official policy or custom of the municipality. See Monell v. Department of Social Services, 436 U.S. 658, 690-94 (1978). To prevail, a plaintiff "must first prove the existence of a municipal policy or custom" that caused the injuries, and must establish a causal connection between the policy and the alleged constitutional violation. Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985). A municipal policy or custom may be proved by showing that the government officials responsible for establishing municipal policies took the actions or made the decisions which caused the alleged violation of the plaintiff's civil rights. See Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986).

Despite these well-established principles of law, plaintiff does not point out the policy or custom at issue, identify the evidence in the record establishing the policy or custom, or defend the summary judgment motion by arguing that defendant Lehman was acting as a "final policymaker" under City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). Indeed, in responding to defendants' summary judgment motion, plaintiff's counsel does not even address the municipal liability arguments made by the County.

The failure to do so amounts to an abandonment of their municipal liability claim.  See Anti-Monopoly Inc. v. Hasbro, Inc., 958 F.Supp.895, 907, n.11 (S.D.N.Y. 1997)(deliberate "failure to provide argument on a point at issue constitutes abandonment of the issue").  Accordingly, it is my Report and Recommendation that the Erie County be dismissed as a defendant in this action because the record does not support any basis for municipal liability.

Defamation:  In his opposition papers, plaintiff withdraws his state law defamation claim, but alleges that he has established the requirements of a "stigma-plus" defamation claim under federal law. In his "stigma-plus" claim, plaintiff invokes the protections of the Due Process Clause which courts have found extends to a loss of a person's reputation "if that loss is coupled with the deprivation of a more tangible interest, such as government employment." Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004).  "For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment." Id. citing Board of Regents v. Roth, 408 U.S. at 573.  This type of claim is commonly referred to as a "stigma-plus" claim.  Id.

The first prong of a "stigma-plus" claim requires the plaintiff to show defamation, namely, that the government made stigmatizing statements about him that called into question his

"good name, reputation, honor or integrity." <u>Quinn v. Syracuse Model Neighborhood Corp.</u>, 613 F.2d 438, 446 (2d Cir. 1980). A plaintiff generally is required to raise the falsity of these stigmatizing statements and must prove these statements were made public. <u>Abramson v. Pataki</u>, 278 F.3d 93, 101-02 (2d Cir. 2002). Assuming that a plaintiff is able to show damage to reputation, there is a second requirement in order to merit constitutional protection. A plaintiff seeking to prevail under a stigma plus claim must show more than simply stigma. The plaintiff must also show a "significant alter[ation] of status" in addition to the alleged stigma. <u>Paul v. Davis</u>, 424 U.S. 693, 710-11 (1976).

Assuming *arguendo* that plaintiff meets all the other requirements, the "plus" prong is missing here. The plus prong requires plaintiff to prove deprivation of some tangible interest or property right. <u>Segal v. City of New York</u>, 459 F.3d 207, 211 (2d Cir. 2006). <u>See</u> <u>Martinez v. City of New York</u>, 2003 WL 2006619, *8 (S.D.N.Y. April 30, 2003)("even assuming that defamatory statements were made, Martinez cannot establish 'stigma plus' because any such statements did not occur in the context of a dismissal, refusal to hire or deprivation of some other legal right or status"). As set forth earlier in this Report and Recommendation, the current record does not support plaintiff's claim that he was deprived of a constitutionally protected property interest by the defendants. While the parameters of the "plus"

requirement have not been defined with particularity, it is clear that "the deleterious effects which flow directly from a sullied reputation would normally . . . be insufficient." <u>Valmonte v. Bane</u>, 18 F.3d 992, 1001 (2d Cir. 1994). These would typically include the impact that defamation might have on job prospects, or, even romantic aspirations, friendships, self-esteem, or any other usual consequences of a bad reputation. <u>Id.</u> Plaintiff's transfer to another job location does not meet the "plus" requirement. <u>Cassidy v. Scopetta</u>, 365 F.Supp.2d 283, 289 (E.D.N.Y. 2005)(fact that plaintiff was transferred to less desirable job without loss of pay or rank does not meet "plus" prong); <u>Martinez v. City of New York</u>, 2003 WL 2006619, *8 (S.D.N.Y. April 30, 2003)(job transfer does not meet "plus" prong where new assignment is at same level of pay and same job title). The fact that plaintiff was only in the new work location for a few weeks before going out on extended sick leave only fortifies his inability to satisfy the "plus" prong. For these reasons, it is my Report and Recommendation that defendants' motion for summary judgment as to plaintiff's "stigma-plus" claim be granted.

## Conclusion

For the reasons stated herein, it is my Report and Recommendation that defendants' motion for summary judgment be

granted as to plaintiff's due process claim and "stigma-plus" defamation claim.   As to plaintiff's First Amendment retaliation claim, it is my Report and Recommendation that defendant's motion for summary judgment be granted with respect to the municipal defendant and denied with respect to the individual defendants.


**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: June 26, 2007
Rochester, New York

32

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R. Civ.P. 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3(a)(3).

The district court will ordinarily refuse to consider on de novo review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  See e.g. Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Ltd., et al., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

Jonathan W. Feldman
United States Magistrate Judge

Dated: June 26, 2007
Rochester, New York

33